# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | CASE NO. 06-CV-1952 JLS (JMA) |
| Plaintiff, | **ORDER HOLDING DEFENDANTS IN CONTEMPT OF JANUARY 7, 2009 FINAL ORDER AND ORDERING SANCTIONS** |
| vs. | |
| NEOVI, INC., d/b/a NEOVI DATA CORPORATION and QCHEX.COM, et al., | |
| Defendants. | |

On September 16, 2008, the Court granted summary judgment in favor of Plaintiff, Federal Trade Commission ("FTC") against Defendants Neovi, G7 Productivity Systems, Thomas Villwock, and James M. Danforth ("Defendants"). (SJ Order, ECF No. 105.) In that Order, the Court held that security failures in Defendants' Internet banking services constituted violations of the FTC Act. Subsequently, the Court ordered Defendants to disgorge $535,358 in revenue and permanently enjoined them from "creating or delivering any check for a consumer" without undertaking measures to protect consumers, which were specifically detailed in that Order. (Final Order, ECF No. 117.) Defendants appealed these Orders.

On October 15, 2009, the FTC filed an application for an order to show cause why Thomas Villwock, James M. Danforth, G7 Productivity Systems, iProlog Corporation, and FreeQuick Wire Corporation (collectively, "Contempt Defendants") should not be held in contempt of the Final

1  Order.  (App. for Order to Show Cause ("OSC"), ECF No. 156.)  The Court issued an OSC, but
2  stayed the hearing pending the Ninth Circuit's decision on Defendants' appeal.  (ECF Nos. 170,
3  177.)  The Ninth Circuit affirmed the Court's rulings.  *FTC v. Neovi*, 604 F.3d 1150 (9th Cir.
4  2010).  On April 27, 28, August 31, and September 1, 2011, the Court held a contempt hearing.
5  The parties then filed a joint designation of the record with evidentiary objections (Joint
6  Designation of Record ("JDR"), ECF No. 252), proposed findings of fact (Defs.' Proposed
7  Findings of Fact ("DFF"), ECF No. 253; Pl.'s Proposed Findings of Fact ("PFF"), ECF No. 264),
8  "closing" memoranda of points and authorities (Defs.' Opp'n to Contempt, ECF No. 253; Pl.'s
9  Mem. ISO Contempt, ECF No. 258) and replies (Defs.' Reply, ECF No. 269; Pl.'s Reply, ECF No.
10 268).  The matter was fully briefed and deemed submitted on December 12, 2011.  The Court has
11 carefully considered the arguments and evidence proffered.  For the following reasons, the Court
12 finds by clear and convincing evidence that the Contempt Defendants are in civil contempt of the
13 Court's January 7, 2009 Final Order, and awards appropriate sanctions.

## LEGAL STANDARD

15      A district court has inherent power to enforce compliance with its orders through civil
16 contempt.  *Spallone v. United States*, 493 U.S. 265, 276 (1990); 18 U.S.C. § 401(3).  In
17 determining whether civil contempt is warranted, the focus of the inquiry is whether "defendants
18 have performed all reasonable steps within their power to insure compliance with the court's
19 orders."  *Stone v. City of San Francisco*, 968 F.2d 850, 856 (9th Cir. 1992), *cert. denied*, 506 U.S.
20 1081 (1993) (internal quotations omitted).  Thus, "[o]ne need not commit an unlawful act in order
21 to be liable for" contempt—one need only disobey a court order.  *NLRB v. Laborer's Int'l Union*
22 *of N. Am.*, 882 F.2d 949, 954 (5th Cir. 1989).

23      The party moving for contempt bears the burden of establishing by clear and convincing
24 evidence that the contemnors violated a specific and definite order of the Court.  *See Balla v.*
25 *Idaho State Bd. of Corrections*, 869 F.2d 461, 466 (9th Cir. 1989).  "The burden then shifts to the
26 contemnors to demonstrate why they were unable to comply."  *FTC v. Affordable Media, LLC*,
27 179 F.3d 1228, 1239 (9th Cir. 1999).  The contemnors' good faith or intent in attempting to
28 comply with the order is immaterial.  *See Stone*, 968 F.2d at 856-57.

The district court has wide latitude and a broad range of civil contempt sanctions at its disposal, such as "fine[s], imprisonment, receivership, and a broader category of creative, non-traditional sanctions." *United States v. States of Tenn.*, 925 F. Supp. (W.D. Tenn. 1995); *see also Hook v. Arizona*, 907 F. Supp. 1326, 1339 (D. Az. 1995). "The Supreme Court has repeatedly emphasized the broad equitable remedies to the necessities of the particular cases, especially where a federal agency seeks enforcement in the public interest." *SEC v. Wencke*, 622 F.2d 1363, 1371 (9th Cir. 1980); *see also SEC v. Hickey*, 322 F.3d 1123, 1131 (9th Cir. 2003) (authorizing asset freeze of third party to effectuate relief). Sanctions may be imposed to coerce Defendants into compliance with the Court's Order, to compensate the party pursuing the contempt action for losses sustained as a result of the contemptuous behavior, or both. *United States v. United Mine Workers*, 330 U.S. 258, 303-04 (1947); *United States v. Bright*, 596 F.3d 683, 696-97 (9th Cir. 2010).

**DISCUSSION**

The facts pertaining to relevant prior proceedings in this action are thoroughly summarized in the Court's previous orders and the Ninth Circuit's opinion affirming the Court's rulings. *FTC v. Neovi*, 604 F.3d at 1153-1160. Because those facts and procedural history are familiar to the parties, the Court recites them here only as necessary to explain its reasoning.

**1. The Underlying Action and Final Order**

By way of brief summary, in the underlying action the Court found that Defendants Neovi, G7, Danforth, and Villwock (together, "Qchex") created and delivered unverified, and in many cases fraudulent, checks for consumers using the website qchex.com with an extreme lack of diligence and causing substantial injury to consumers in violation of the FTC Act, 15 U.S.C. § 45. On January 7, 2009, the Court ordered Qchex to disgorge $535,358 in revenue and permanently enjoined "Defendants, their officers, agents, servants, employees, attorneys, and those persons in active concert or participation with them who receive actual notice of this Order" from engaging in any similar unfair business practices without taking specified measures to protect consumers.

Specifically, Defendants were prohibited from "creating or delivering any check for a customer" without: (1) performing the account and identity verification procedures identified in

1  the Order, (2) disclosing certain information on each check directly or indirectly created or
2  delivered, and (3) adequately providing for and responding to consumer complaints as stated in the
3  Order. (Final Order 4-8.) In so ruling, the Court explicitly contemplated that the Final Order
4  would apply beyond Qchex. (*See* Final Order 13 ("Defendants' pattern of conduct demonstrates a
5  significant disregard for check fraud and a significant likelihood of future violation. . . .
6  [F]ollowing the bankruptcy of Qchex, Defendants opened up two more businesses offering the
7  same basic functionality. Given the seriousness and deliberateness of Defendants' past record of
8  violations, injunctive relief is appropriate." (citation omitted)).) Indeed, those who are found to
9  have violated the FTC Act "must expect some fencing in." *FTC v. Nat'l Lead Co.*, 352 U.S. 419,
10 431 (1957); *see also FTC v. Colgate-Palmolive Co.*, 380 U.S. 374, 395 (1965) (holding that courts
11 may frame an injunction based on a violation of the FTC Act broadly enough to prevent the
12 defendant from engaging in similar illegal conduct in the future); *Int'l Rectifier Corp. v. IXYS
13 Corp.*, 383 F.3d 1312, 1318 (9th Cir. 2004) (rejecting argument that contempt proceedings are
14 unavailable with respect to pre-judgment devices not accused of infringement in the underlying
15 action).
16      Thus, the question currently before the Court is whether the Contempt Defendants have
17 continued to engage in check creation and delivery services without complying with the
18 requirements of the Final Order, in violation of the clear provisions of the Court's Final Order.
19 Before turning to that discussion, the Court reviews the relevant parties and evidence before the
20 Court, including making the necessary evidentiary rulings.
21 **2. The Contempt Defendants**
22 *A. Defendants Named in Underlying Action*
23 *(i) Thomas Villwock*
24      Contempt Defendant Thomas Villwock ("Villwock") was the owner, President, and Chief
25 Executive Officer ("CEO") of Neovi, the Defendant corporation that marketed and operated a
26 series of software programs on the website www.qchex.com ("Qchex") from 2000 through 2006.
27 (SJ Order 2.) Villwock designed the Qchex business model of check creation and delivery. (SJ
28 Order 2, 3-5.) He is also the owner and CEO of Contempt Defendant iProlog, a corporation that

was essentially built from the rubble of Neovi's bankruptcy in October 2007. (PFF ¶¶ 2, 48-49; SJ Order 3.) Additionally, Villwock describes himself as a "business consultant" for Contempt Defendant G7 Productivity Systems ("G7"), but he exerts considerable control over the operations of G7 and is considered by its employees to be the *de facto* President. (PFF ¶¶ 3, 33-47; SJ Order 3; 604 F.3d at 1154 n.4.) Along with Defendant Danforth, Villwock helped launch another check creation and delivery website known as "freequickwire.com," and served as the President of the FreeQuick Wire Corporation ("FQW"). (PFF ¶¶ 5, 97; SJ Order 3.)

*(ii) James Danforth*

Contempt Defendant James Danforth ("Danforth") was Neovi's Chief Operating Officer, ("COO"), Treasurer, Secretary, and registered service agent. (SJ Order 2; PFF ¶ 9.) Among other things at Neovi, he managed Qchex. (SJ Order 2.) Danforth is also the President of iProlog, having served previously as its COO, and has been an officer of G7 since 2000, serving in many roles as Executive Vice President ("EVP"), Chief Financial Officer ("CFO"), Secretary, and registered service agent. (PFF ¶¶ 10-12); 604 F.3d at 1154 n.4. As mentioned above, Danforth helped launch the FQW website and was COO of the FQW corporation. (PFF ¶ 14.)

*(iii) G7 Productivity Systems*

Contempt Defendant G7 is a California corporation that produces check software, ink, and paper—including VersaCheck® 2010 and 2012 software, VersaCheck® paper, VersaInk™, and Validation Codes—for sale to U.S. retailers and consumers through its website, www.g7ps.com. (SJ Order 2; PFF ¶¶ 15, 19-21.) At least through March 2011, G7 also controlled the Qchex website as well as the website www.versacheck.com. (PFF ¶¶ 22-23, 26-29.)

**B. Post–Final Order Defendants**

*(i) iProlog Corporation*

Neovi declared bankruptcy in October 2007 and subsequently went out of business; Villwock and Danforth established iProlog Corporation the very next day, hiring the same employees, using the same equipment and office location, conducting Neovi's former business activities, and paying for many expenses using G7 funds. (SJ Order 3; PFF ¶¶ 49, 52-56); 604 F.3d at 1153 n.2. Although not a named Defendant in the underlying action, the Court and parties

were aware of iProlog's involvement in Defendant's check creation and delivery scheme at the time of the Summary Judgment Order and Final Order. (*See* SJ Order 3); 604 F.3d at 1153 n.2.

*(ii) FreeQuick Wire Corporation*

On November 8, 2007, Defendants Villwock and Danforth formed FreeQuick Wire Corporation ("FQW"), with Danforth as the COO, Villwock as President, and Villwock's daughter, Diana Villwock, as the corporation's sole director. (PFF ¶¶ 95-96, 105.) The purpose of FQW was to hold the FQW website. (PFF ¶ 97.) Although FQW was directed to appear and show cause why it should not be held in contempt by the Court's OSC, FQW has not entered an appearance in these contempt proceedings. (*See* OSC, ECF No. 170; Pl.'s Mem. ISO Contempt 2 n.1.)

**3. Contempt Proceedings**

*A. Evidence Presented*

At the contempt hearing, the parties presented evidence through live testimony, deposition testimony, declarations, and other exhibits. The evidence presented without objection included:

- Declarations in Support of Contempt of Leslie Lewis (Ex. 528), Ronald Lewis (including excerpts from Supplemental Declarations) (Exs. 553, 642-43), William Burton (Ex. 596), Bernadette Harding (Ex. 635), Denise Owens (Ex. 583), and Janet Wright (Ex. 634);
- Deposition testimony of James Danforth, Thomas Villwock, G7, and iProlog (subject to supplementation) (Exs. 581-82, 645-51);
- In-court Testimony of Ronald Lewis, James Danforth, Thomas Villwock, and Diana Villwock; and
- Other documents, including website printouts, receipts, checks, reports, emails and letters, catalogs and instructions, and corporate documents such as employee lists, sales summaries, tax returns and other records and filings (Exs. 1, 2, 5, 6, 7 (page 1 only), 9, 10, 13 (pages 2 and 3 only), 14-16, 20-22, 25, 26, 44, 45, 501-15, 517-22, 525, 529-52, 554-95, 597-633, 636-41, 644, 652-57, 738, 740-42, 744-49, 751-58).

//

//

Other evidence was presented with objection, as follows:

- Third-party consumer complaints (Exs. 526, 527);
- Depositions and associated exhibits from six third-party consumers, Christina Keheley, Audrey O'Neil, Kristy Smith, Melva Talley, Joseph Cassidy, and Christine Andrews (Exs. 658-737);
- Qchex website printouts from January 2010 (Exs. 739, 743) and June 2010 (Exs. 514, 515);
- Plaintiff's Dec. 4, 2009 requests for production to iProlog (Ex. 516);
- VersaCheck® 2012 and VersaCheck® for Quickbooks (Exs. 523, 524); and
- In-court Testimony of Dan Fisher.

### B. Evidentiary Rulings

*(i) Objections to Plaintiff's Evidence*

(a) Third-Party Consumer Complaints

At the contempt hearing, the parties disputed the admissibility of exhibits detailing various documented consumer complaints. (4/27 Hr'g Tr. 181-85; 4/28 Hr'g Tr. 193-99; 8/31 Hr'g Tr. 13-17). These consisted of two distinct types: (1) those found through an Internet search (Ex. 526), and (2) those made directly to the FTC (Ex. 527). (4/27 Hr'g Tr. 182:4-183:7.) Of the latter category, some of the complaints pertained generally to fraudulent or suspicious activity in connection with VersaCheck software or other related products (Ex. 527 at 1-52), while others more specifically mentioned a "mystery shopper" scheme in conjunction with one or more of Contempt Defendants' products (Ex. 527 at 53-507). Contempt Defendants objected to these exhibits as hearsay and as irrelevant to the Court's determination of contempt. (4/27 Hr'g Tr. 177:15-20, 182:10-17.) In particular, they argued that the "mystery shopper" scheme complaints that did not even reference VersaCheck or contain any link to Contempt Defendants should be excluded as highly prejudicial. (4/28 Hr'g Tr. 195:9-196:6.)

The Court admitted the consumer complaints that pertained explicitly to the Contempt Defendants, Exhibit 526 and pages 1-52 of Exhibit 527, under Federal Rule of Evidence 807, the residual exception to hearsay. (4/28 Hr'g Tr. 197:23-199:5.) The Court found the documents

relevant to the issue of the FTC's requested remedy of equitable disgorgement, and possessing sufficient circumstantial guarantees of trustworthiness here, as explained in *FTC v. Figgie*, 994 F.2d 595, 608-09 (9th Cir. 1993) (finding consumer complaints in the form of letters written to the FTC admissible under the residual hearsay exception, then Federal Rule of Evidence 803(24), as relevant to the requested remedy—there, consumer redress).  However, the Court reserved ruling on the issue of the admissibility of the complaints to the FTC from consumers regarding "mystery shopper" scheme at the hearing.  (4/28 Hr'g Tr. 199:6-12.)

The FTC conceded at the contempt hearing that the disputed complaints are not tied directly to Contempt Defendants through VersaCheck or any other product, admitting that the FTC could not prove that the checks referenced in those complaints were created with VersaCheck.  (4/28 Hr'g Tr. 197:16-17.)  Indeed, such linkage would be impossible given Contempt Defendants failed to print identifying information anywhere on the face of the checks themselves as required by the Court's Order.  (4/28 Hr'g Tr. 194:17-23, 196:8-197:3.)  Thus, the FTC would only be able to determine what types of checks were used in these "mystery shopper" schemes by tracking down the person who initially sent the check.  (*Id.*)  In a few cases, the FTC was able to do just that, and offered those individuals' depositions as evidence as well.  (*See* Part B(i)(b), *infra*.)

The Court understands the FTC's frustration at being stymied from narrowing the "mystery shopper" scheme complaints to those specifically using Contempt Defendants' products by the very fact of Contempt Defendants' failure to comply with the Final Order.  However, that frustration cannot justify the Court finding all of these complaints relevant merely because they pertain to a certain type of fraud scheme.  As the Court has reiterated throughout these contempt proceedings, the narrow issue currently before the Court is whether Contempt Defendants violated the Final Order.  The Court has repeatedly excluded evidence relating to competitor products and "the check creation industry" that does not bear on this narrow issue.  Further, the FTC has provided some evidence of the mystery shopper scheme being used in conjunction with Contempt Defendants' products (*see, e.g.*, Third-Party Depositions and Exhibits, *infra* Part B(i)(b)), and so the exclusion of these numerous untethered complaints will cause little prejudice to the FTC.  For these reasons, the Court finds pages 53-507 of Exhibit 527 are properly excluded.

(b)  Third-Party Consumer Depositions and Exhibits

The FTC also offered into evidence portions of depositions of six "consumers," Christina Keheley, Audrey O'Neil, Kristy Smith, Melva Talley, Christina Andrews, and Joseph Cassidy (Exs. 658, 674, 703, 710, 732, 734), as well as the associated deposition exhibits (Exs. 659-73, 675-702, 704-09, 711-31, 733, 735-37).  These individuals explained their experiences as victims at different stages of "mystery shopper" fraud schemes, which were perpetrated using VersaCheck products.  The FTC argues the testimony illustrates the type and severity of consumer harm created by Contempt Defendants' products.  Contempt Defendants objected on several bases.  First, they argued that admission of only the FTC's selected excerpts is improper because "they don't tell the full story of how the scams actually happened." (4/27 Hr'g Tr. 14:2-13.)  Further, they objected that the FTC had not shown the witnesses were unavailable to testify at the hearing, and that the transcripts are irrelevant to the contempt issue before the Court.  (8/31 Hr'g Tr. 16:16-18.)  The FTC agreed to provide the Court with the full transcripts, and suggested Contempt Defendants supply counter-designations.  (4/27 Hr'g Tr. 14:15-25.)  The Court provisionally admitted the FTC's consumer deposition excerpts and exhibits, and also received the full transcripts.  (8/21 Hr'g Tr. 17:11-18.)

Unlike the consumer complaints, *supra* Part B(i)(a), this evidence pertains directly to the use of Contempt Defendants' products.  The Court finds that the deposition testimony of the six consumers is relevant, and further that it is admissible under Federal Rule of Civil Procedure 32.  All six deponents live more than 100 miles from San Diego, California.[1]  (*See* 8/31 Hr'g Tr. 13:5-17.)  Contrary to Contempt Defendants' assertion at the hearing, the definition of an unavailable witness under Rule 32(a)(4)[2] does not contain a requirement that the witness be unwilling to testify at the hearing. (*See* 8/31 Hr'g Tr. 17:6-8.)  Contempt Defendants had a full and fair opportunity to cross examine these witnesses at their depositions, and—as the FTC points out—these cross-

---

[1] At the time of the depositions and contempt hearing, the consumer witnesses lived in Georgia, Florida, Texas, and Pennsylvania.

[2] Fed. R. Civ. P. 32(a)(4) provides, in pertinent part: "A party may use for any purpose the deposition of a witness, whether or not a party, if the court finds: . . . (B) that the witness is more than 100 miles from the place of hearing or trial or is outside the United States, unless it appears that the witness's absence was procured by the party offering the deposition."

1  examinations were quite lengthy. (Pl.'s Mem. ISO Contempt 29 n.18.) In addition, Contempt
2  Defendants have been repeatedly given the opportunity to counter-designate portions of the
3  transcripts not included in the FTC's excerpts. (4/27 Hr'g Tr. 15:24-16:3; 8/31 Hr'g Tr. 15:15-
4  16:13.) They have apparently now done so in their post-hearing briefs. For these reasons, the
5  Third-Party Consumer Depositions and Exhibits are admitted.
6  (c) Other Exhibits
7  Finally, Contempt Defendants objected to the admission of seven other exhibits at the
8  contempt hearing on the basis of relevance. (*See* 4/27 Hr'g Tr. 152:18-22; 4/28 Hr'g Tr. 360:22-
9  361:14.) These consist of: (1) printouts from the Qchex website, including the Homepage, the
10 "How it Works" page, the "Bank Compliant" page (with FQW ad), the "Supplies" page (selling
11 VersaCheck, VersaInk, and VersaToner products), and the "Create Checks" page (Ex. 514); (2) a
12 press release published on Forbes.com about Qchex.com, entitled "Qchex.com Publishes FREE
13 Check Creation Solutions for Microsoft(R) Word and Adobe(R) Acrobat(R)," explaining the
14 services offered by Qchex, including safety issues (Ex. 515); (3) a list of the FTC's first requests
15 for production to iProlog (Ex. 516); (4) a series of screen-shots taken from a computer installing
16 VersaCheck® 2012, including prompts to register the software using the Internet, and prompts to
17 print, write, send, or receive checks (Ex. 523); (5) a list of G7 products, including VersaCheck for
18 Quickbooks, as well as VersaInk, VersaToner, and VersaScan, sold on http://g7ps.com (Ex. 534);
19 (6) a copy of a notice from Qchex.com regarding suspended third-party validation (Ex. 739); and
20 (7) a copy from http://g7ps.com of G7's description of VersaInk (Ex. 743). Because these
21 Exhibits pertain to the operation, use, and/or sale of Contempt Defendants' products, the Court
22 finds they are all relevant and properly admitted.
23 *(ii) Objections to Contempt Defendants' Evidence*
24 (a) Expert Testimony of Dan Fisher
25 Prior to the contempt hearing, the FTC moved to exclude the testimony of Contempt
26 Defendants' expert witness, Dan Fisher. (ECF No. 208.) The Court reserved its ruling on the
27 motion, noting that in the context of a bench trial, the importance of the trial judge's gatekeeping
28 role with regard to expert testimony is limited, because "the judge is the trier of fact and has an

1  ongoing opportunity to evaluate the admissibility and weight of expert testimony."  (MIL Ruling
2  3, ECF No. 223) (citation omitted); *see also Deal v. Hamilton Cnty. Bd. of Educ.*, 392 F.3d 840,
3  852 (6th Cir. 2004) ("The 'gatekeeper' doctrine was designed to protect juries and is largely
4  irrelevant in the context of a bench trial."); *FTC v. Connelly*, 2007 WL 6492913, at *2 n.2 (C.D.
5  Cal. Aug. 10, 2007) ("Because this is a bench trial, the Court need not preclude the experts'
6  testimony because of potential problems with the sufficiency of facts or data relied on or the
7  reliability of the methods used to formulate their opinions.  Rather, the Court can evaluate the
8  experts' testimony against the Rule 702 standard as they testify.")

9  Contempt Defendants called Dan Fisher to testify at the contempt hearing on September 1,
10 2011.  (8/1 Hr'g Tr. 120:21-210:2.)  As the Court indicated at the hearing, his testimony about the
11 industry of check creation, validation, and fraud was of minimal relevance to the sole issue
12 presently before the Court—whether Contempt Defendants have violated the Final Order.
13 Consequently, the Court admits Mr. Fisher's testimony, and may rely on his expert opinion where
14 appropriate, but notes that it finds his opinions of limited utility here.

15 **4. Violations of the Final Order**

16 Based on all of the evidence before the Court, The FTC alleges that Contempt Defendants
17 violated the Final Order through FQW, VersaCheck software, and the Qchex.com Templates, and
18 continue to violate it through VersaCheck software and gValidate.com.  (*See generally* Pl.'s Mem.
19 ISO Contempt.)  The FTC argues these violations cause substantial consumer harm, and that
20 Contempt Defendants should pay compensatory and coercive sanctions.

21 In order to establish Contempt Defendants' liability for civil contempt, the FTC must show
22 by clear and convincing evidence that the Contempt Defendants are bound by and have violated a
23 specific and definite Order of the Court.  *See Whittaker Corp. v. Execuair Corp.*, 953 F.2d 510,
24 517 (9th Cir. 1992).  As discussed below, the Court finds that the FTC has met this burden.

25 *A.  Contempt Defendants are Bound by the Final Order*

26 The Final Order binds "Defendants, their officers, agents, servants, employees, attorneys,
27 and those persons in active concert or participation with them who receive actual notice of this
28 Order by personal service or otherwise."  (Final Order 4.)  Further, Federal Rule of Civil

Procedure 65(d) provides that a permanent injunction is binding on a party with actual notice, including those individuals related to a party, as described by the Court in the Final Order.

Through the individual Defendants Villwock and Danforth, all of the Contempt Defendants had actual notice of the Final Order. As already discussed, *supra* Part 2, Contempt Defendants Villwock and Danforth operated and controlled all three corporate Defendant businesses. Further, the Court agrees with the FTC that the corporate Contempt Defendants G7, iProlog, and FQW operate as a "maze of interrelated companies" forming a "common enterprise," s*ee FTC v. J.K. Publ'ns, Inc.*, 99 F. Supp. 2d 1176, 1202 (C.D. Cal. 2000), such that all Defendants are "in active concert or participation" with each other under the terms of the Final Order. Contempt Defendants Villwock and Danforth exercise a common control over these corporate entities, illustrated by the commingling of funds and operations, including control of websites, accounts, and employees; the routine performance of work by an employee of one corporation for the other corporation; and the integration of technology between the corporations, including software. (*See* Pl.'s Mem. ISO Contempt 4 n.2.) Contempt Defendants' attempts to obfuscate these interdependent relationships, largely by shifting blame onto Defendant Villwock's daughter or brother, were simply not credible or convincing.

Contempt Defendants also attempt to escape the scope of the Court's Final Order by asserting that the Qchex.com and FQW websites are no longer in operation as check creation or delivery services. (8/31 Hr'g Tr. 144:22-145:4; 9/1 Hr'g Tr. 110:19-22.) Both of these websites now redirect to the VersaCheck website, which, they claim, they have no control over. It is undisputed that the VersaCheck line of software remains on the market and available for use by consumers, including VersaCheck® 2010 and 2012, and that new versions of the software, including VersaCheck® X1, continue to be developed and sold at versacheck.com, a website nearly identical to the former g7ps.com website. (9/1 Hr'g Tr. 109:23-110:1, 111:3-24; Exs. 504, 755, 756.) Although Contempt Defendants argue again and again that they no longer have any control over VersaCheck products, the Court rejects these unsupported and incredible assertions. The "new" corporate face of the operation, Global BizForce, has hired exclusively former employees of iProlog or G7, and even uses the same ink supplier as G7—Diversified Nano

Corporation, owned by Villwock's brother.  (PFF ¶¶ 120, 125-139, 140, 142-46.)  Indeed, Contempt Defendants Villwock, Danforth, and iProlog continue to "work actively" with the new company, including consulting on software architectures and website technologies.  (PFF ¶¶ 122-23, 559-60.)  Global BizForce and iProlog even share office space.  (PFF ¶¶ 561-62.)  The Court finds that all Contempt Defendants had notice of and are bound by the Final Order with regard to their activities creating and delivering checks for consumers using this interrelated web of companies.  As the scheme currently in operation, this Order focuses on the VersaCheck line of software products.

### B. The Final Order is Specific and Definite

As described by the Ninth Circuit, the Final Order required Qchex to "disgorge $535,358 in revenue and permanently enjoined [Qchex] from operating any similar business without taking appropriate, specified measures to protect consumers."  *FTC v. Neovi*, 604 F.3d at 1153.  Specifically, Defendants are prohibited from "creating or delivering any check for a customer, unless they perform the verification procedures identified" in the Final Order.  *See id.* at 1160.  These procedures include identity and account verification, as well as disclosure of contact information on checks created.

Although Contempt Defendants argue that they are not "sophisticated" and thus cannot be expected to have understood the provisions of the Final Order, they do not specifically argue that any of the required procedures are unclear.  Instead, Contempt Defendants argue that they cannot violate the Final Order through the VersaCheck software because it is not a web-based check creation and delivery system, like Qchex.  (Def.'s Opp'n to Contempt 13.)  VersaCheck, in their estimation, is not a service but a *product*, outside the scope of the Final Order.  (*Id.*)  However, as indicated by the clear provisions of the Final Order, this is a distinction without a difference.  The Final Order is not limited to the drafting and printing of checks for customers.  Instead, by defining "create a check" and "deliver a check," the Final Order specifically applies to "any involvement in the creating, designing, composing, drawing, or writing on paper or electronic media a check drawn on a specific financial institution" or "any involvement in the . . . e-mailing, sending, or transmitting by any other method a check drawn on a specific financial institution."

(Final Order 3.) The Court agrees with the FTC that the Final Order, which does not apply merely to "web-based systems," but rather to "check creation," by its plain language reaches beyond schemes exactly like Qchex. Contempt Defendants have failed to offer any convincing arguments that they are not engaged in the provision of a good or service in connection with check creation, or a "check delivery service." Thus, the specific and definite terms of the Final Order apply to Contempt Defendants' activities relating to their VersaCheck software, which takes information from a user and transforms it into a negotiable instrument that the user may deliver electronically or print.

### C. Conduct Constituting Violations

*(i) Identity and Account Verification Procedures*

Bound by the terms of the Final Order, Contempt Defendants are required to perform identity verification of prospective customers by: "engaging a person not related to, controlled by, or owned by any of the Defendants, either in whole or part, to obtain information from and about each prospective customer and having that person use the information to verify the prospective customer's identity," and to perform account control verification for each financial account, either by:

> A. engaging a person not related to, controlled by, or owned by any of the Defendants, either in whole or in part, that provides account control verification services for its clients to verify a customer's authority to draw funds on a financial account by obtaining from a customer the customer's online banking user name and password information and transferring the information to the financial institution identified by the customer, and only permitting the customer to create an account with any of the Defendants when the online banking user name and password are confirmed by the person engaged. The Defendants shall enter into a written contract with the person that provides account control verification services prohibiting that person from using the customer's online banking user name or password for any purpose other than providing account control verification services pursuant to this Order; <u>or</u> by
>
> B. using deposits for account control verification by depositing at least two random deposits between $.01 and $.99 into the customer's financial account without disclosing the amounts to the customer, requiring the customer to confirm the amount of each deposit, and only permitting the customer to create an account with any of the Defendants when the customer is able to correctly state the amount of each deposit after no more than three attempts.

(Final Order 4-5.) In the alternative, Contempt Defendants may forego these identity and account verification procedures and instead

>[e]ngage a <u>monitor</u> that has been agreed to by both Defendants and Plaintiff, and establish and utilize procedures that the monitor has approved as effective to verify:
>
>   a.   the identity of each prospective customer; <u>and</u>
>
>   b.   the authority of each such customer to draw funds on a financial account before creating an account for that customer with any of the Defendants.
>
>***PROVIDED, however***, that, in addition to the record keeping provisions described in section VI, paragraph F of this Order, Defendants, for a period of eight (8) years from the date of entry of this Order, shall create and maintain documents (either in paper or electronic format) that demonstrate that Defendants have performed the verification procedures set forth in both paragraphs 1 and 2 together, or those in paragraph 3 alone.  Defendants shall be responsible for any and all fees and expenses incurred to comply with this order, including, without limitation, any and all fees and expenses related to engaging third parties and a monitor.

(Final Order 6.)  It is undisputed that Contempt Defendants have not engaged a third party or monitor to provide identity and account control verification services as specified.  (*See* Ex. 646, Danforth Dep. 43:23-44:5.)  Nor do Contempt Defendants use the alternative method of account control verification allowed under the Final Order—random deposits with consumer confirmation.  Accordingly, as discussed below, Contempt Defendants are in direct violation of the identity and account verification provisions of the Final Order.

At the contempt hearing, Mr. Danforth testified that the VersaCheck software does not contain any process for the validation of a person's identity or that person's authority to use the account over which they are writing a check before allowing check creation.  (8/31 Hr'g Tr. 172:25-173:17.)  In order to use Contempt Defendants' products to create checks, individuals purchase the VersaCheck software and install it on their computers.  Individual users must input a valid activation code to use the software, which the software delivers to the server, where it is verified against G7's list of valid codes.  During that process, users have the option, but are not required, to register the software with G7.  But neither through code verification, registration, nor any other process does the VersaCheck software implement any identity or account control procedures.  This failure was further substantiated by Mr. Villwock's testimony at the contempt hearing, which revealed that neither he nor iProlog had taken any steps to validate that users of any VersaCheck software are authorized to use the financial accounts they use with the software,

nor to confirm their identities. (9/1 Hr'g Tr. 75:21-77:25.) And the deposition testimony of the third-party consumers Ms. Keheley and Ms. O'Neil confirm that individuals were able to create checks using VersaCheck software without ever verifying their identities or their account authorizations. (*See* PFF ¶¶ 659, 667-68, 728, 734, 741, 744, 748, 752, 755.)

In an attempt to excuse this admitted failure, Contempt Defendants argue that it would be impossible for them to implement the Final Order's identity and account verification requirements. (Def.'s Reply 10-11.) The theory goes that "VersaCheck is a stand alone software product that is loaded onto and used locally on a user's personal computer. VersaCheck is not an online product, and does not require any network connectivity or capability to create checks. This means that Defendants have no way of identifying VersaCheck users, and consequently cannot verify their identities or bank accounts as a requirement for product use." (*Id.*) Contempt Defendants are further powerless to comply because the offending software has already been released, and so would "remain in contempt of the Final Order until the very last VersaCheck user stops using the software to create checks." (*Id.* at 10.) Finally, Contempt Defendants argue that application of the Final Order's requirements to their software would be so burdensome as to render VersaCheck "entirely unmarketable in the industry." (*Id.* at 13.)

The Court finds these justifications lack credibility and support, and entirely fail to excuse Contempt Defendants' noncompliance. Contempt Defendants' own evidence reveals that its VersaCheck software has the capability to access and integrate information from the Internet. At the very least, the software is able to verify software codes and to allow customer registration of the software. Contempt Defendants cannot seriously contend that it is impossible to upgrade or patch already existing software (or, at worst, to recall it) such that, once software is "out there" nothing can be done. And the Court rejects Contempt Defendants' contention that the implementation of these procedures would put VersaCheck out of business because of consumers' belief that providing the ordered information renders them prone to identity theft. Most strikingly, this contention is belied by Contempt Defendants' own testimony that their new software, VersaCheck X1—in conjunction with gValidate, a system created by Mr. Villwock—does provide superior account (admittedly not identity) protection, albeit not by methods authorized by the Final

Order. (9/1 Hr'g Tr. 69:6-10.) Contempt Defendants do not even attempt to explain this gaping hole in their united theory of impossibility. Additionally, the Court notes that the Final Order's verification methods were adapted from methods well-accepted and widely used in the industry, which undermines the proposition that these methods would render VersaCheck unmarketable.

Instead, it seems much more likely that these procedures are not only quite possible to implement, but also preferred by most reasonable consumers, who would view them as *protections* from identity theft and check fraud. And by using a method identified in the Final Order, Contempt Defendants need not force consumers to divulge more information than is already included on the checks they create—a name and a bank account number. Under the terms of the Final Order, Contempt Defendants are in no way required to anticompetitively needle consumers into divulging more information; instead, they must simply make the effort (or hire someone else) to verify information already necessary for check creation with the appropriate financial institution, or directly with the consumer. For these reasons, the Court rejects Contempt Defendants' excuses for noncompliance, and finds Contempt Defendants in violation of the Final Order's identity and account verification requirements.

*(ii) Disclosure of Contact Information*

In the Final Order, Contempt Defendants were further enjoined from

> Failing to clearly and conspicuously disclose contact information for Defendants, including, but not limited to, a U.S. postal address, telephone number, and website or e-mail address, in Defendants' advertising or marketing materials, on their Internet website(s), and on any check that they, directly or indirectly, create or deliver.

(Final Order 7.) Aside from pointing to a line of text that reads "G7 Productivity Systems" in "microprint" on some of their blank check products, illegible to the naked eye, Contempt Defendants have not argued that they complied with the Final Order's requirement to disclose contact information on any check they create or deliver. (*See* 8/31 Hr'g Tr. 177:13-179:19.) Indeed, they admit that their checks do not disclose (whether clearly and conspicuously or not) any contact information. And copies of the checks entered into evidence confirm that the face of printed VersaCheck checks do not include Contempt Defendants' U.S. postal addresses, telephone numbers, websites, email addresses, or any other form of contact information. (Exs. 513 at 47,

523 at 38.) The demonstrative check apparently created using VersaCheck X1, proffered by Contempt Defendants, indicates only "gvalidate.com" as a potential source, and so continues to fall far short of providing the required information. (Ex. 21.) As above, the Court finds Contempt Defendants are in violation of the Final Order's contact information disclosure requirements.

## ORDER AND AWARD OF SANCTIONS

For the foregoing reasons, based on clear and convincing evidence, the Court **HOLDS** Contempt Defendants in civil contempt of its January 7, 2009 Final Order permanently enjoining Defendants, their officers, agents, servants, employees, attorneys, and those persons in active concert or participation with them with notice of the Final Order from engaging in check creating or delivery for a customer without satisfying the restrictions imposed by that Order. The Court must now turn to the task of setting the appropriate sanctions for these violations.

Civil contempt sanctions may be imposed for two purposes: to coerce Contempt Defendants into compliance with the Court's Final Order, and to require compensation for losses suffered. *United States v. United Mine Workers of America*, 330 U.S. 258, 303-04 (1947); *Whittaker Corp. v. Execuair Corp.*, 953 F.2d 510, 517 (9th Cir. 1992). "Generally, the minimum sanction necessary to obtain compliance is to be imposed." *Whittaker Corp.*, 953 F.2d at 517 (citing *Spallone v. United States*, 493 U.S. 265, 280 (1990)). Here, the Court agrees with the FTC that a coercive sanction should issue until Contempt Defendants demonstrate their compliance with the Final Order. In determining the amount and duration of a coercive fine, the Court considers "the character and magnitude of the harm threatened by continued contumacy, and the probable effectiveness of any suggested sanction in bringing about the result desired." *United Mine Workers*, 330 U.S. at 304; *Whittaker Corp.*, 953 F.2d at 516.

With regard to compensatory sanctions, in the context of civil contempt under the FTC Act it is clear that the Court has broad authority to "grant ancillary relief as necessary to accomplish complete justice, including the power to order restitution." *FTC v. Stefanchik*, 559 F.3d 924, 931 (9th Cir. 2009) (internal quotation marks omitted). Specifically, the Ninth Circuit has stated that "because the FTC Act is designed to protect consumers from economic injuries, courts have often awarded the full amount lost by consumers rather than limiting damages to a defendant's profits."

*Id.* However, here the Court does not agree with the FTC's calculations as to compensatory sanctions, finding the appropriate sanction for restitution or other ancillary relief to be far from clear based on the record. The extent of Contempt Defendants' noncompliance with the Final Order and the amount of harm caused by their refusal to implement the Final Order's required verifications are difficult to quantify in large part because Contempt Defendants continue to conceal their involvement by creating a shifting maze of corporations to mask their violations, and by failing to comply with the disclosure of contact information requirements. To be sure, the existence of harm itself is evident. Indeed, by continuing to create and operate check creation services in direct violation of the Final Order, Contempt Defendants' actions cause the exact same harm caused by Qchex. As explained by the Ninth Circuit, Contempt Defendants "created the checks in the sense that [they] physically brought them into being—or provided the means to do so—and made them appear legitimate and credible in the eyes of consumers," and in so doing, Contempt Defendants "caused harm through [their] own deeds." *FTC v. Neovi*, 604 F.3d at 1157.

Notwithstanding the clear existence of harm caused by Contempt Defendants' actions, based on the evidence currently before it the Court cannot make an exact or even approximate determination of the consumer harm caused by Contempt Defendants' products and ongoing violations.[3] Instead, the Court has attempted to take into account Contempt Defendants' complete disregard for the Court's Final Order, coupled with their troubling attempts to mislead the Court and cover up their web of deceit, in calculating the appropriate coercive sanctions to award here. Accordingly, the Court **HEREBY IMPOSES** sanctions as follows:

**Sanctions for Violating Identity and Account Verification Procedures**

If Contempt Defendants fail to demonstrate to the Court that they have purged their noncompliance with the Final Order's identity and account verification procedures <u>within 30 days</u>

---

[3] The FTC argues that Contempt Defendants should be ordered to disgorge all revenues generated since entry of the Final Order, which apparently total $9,484,463.96, because their failure to provide their contact information on the checks they create makes it impossible to calculate the harm they have caused. (Pl.'s Mem. ISO Contempt 35-40.) However, the Court cannot establish a reasonable level of certainty in these calculations, nor can it conclude based on the evidence before it that total disgorgement of revenue is a proper method of awarding compensatory sanctions in these circumstances. Accordingly, the Court declines to award the full amount requested by the FTC, and focuses instead on the award of substantial coercive sanctions intended to motivate Contempt Defendants' complete and prompt compliance, as explained below.

after entry of this Order, Contempt Defendants shall be required to pay a fine in the amount of **$10,000 per day** until such time as they demonstrate compliance.

### Sanctions for Violating Contact Information Disclosure Requirements

If Contempt Defendants fail to demonstrate to the Court that they have purged their failure to comply with the Final Order's contact information disclosure requirements within 30 days after entry of this Order, Contempt Defendants shall be required to pay a fine in the amount of **$5,000 per day** until such time as they demonstrate compliance.

In addition, to attempt restitution for consumer losses suffered as a result of Contempt Defendants' utter disregard of this core and relatively non-burdensome provision of the Final Order, Contempt Defendants shall pay forthwith a fine of **$100,000**.

### CONCLUSION

All Contempt Defendants shall be held jointly and severally liable for the entire amount of these sanctions. Contempt Defendants are directed to make all payments required by this Order to the FTC, in accordance with instructions to be provided by counsel for the Commission. The FTC is directed to use the funds paid by Contempt Defendants for equitable relief, including but not limited to, consumer redress and any attendant expenses for the administration of such redress. In the event that equitable relief is wholly or partially impracticable or that funds remain after the appropriate equitable relief is completed, such funds shall be deposited to the United States Treasury.

Finally, the Court notes that FTC's Motion to Modify the Final Order (ECF No. 210) was denied without prejudice at the contempt hearing, pending the Court's decision on whether to hold Contempt Defendants in civil contempt of the Final Order and award sanctions. (Hr'g Tr. 151:16-18.) If it wishes, the FTC may renew its motion within 21 days of the date this Order is electronically docketed.

**IT IS SO ORDERED**.

DATED: July 11, 2012

*Janis L. Sammartino*
Honorable Janis L. Sammartino
United States District Judge